**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| KYLE ALEXANDER JODOIN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Case No. 6:26-cv-236-JDK |
| | § | |
| BREANNA MICHELLE WILKINS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Kyle Alexander Jodoin's Verified Petition for the return of his child, A.J., pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Hague Convention"), and the treaty's implementing statute, the International Children Abduction Remedies Act, 22 U.S.C. §§ 9001, *et seq*. ("ICARA"). Docket No. 1. Jodoin alleges that A.J.'s home is in Australia and that A.J.'s mother, Breanna Michelle Wilkins, wrongfully retained the child in the United States.

On July 29, 2026, the Court held an evidentiary hearing during which both parties presented evidence. At the outset of the hearing, Wilkins stipulated that the elements for wrongful retention were established, but argued that Jodoin consented to the retention and that returning A.J. to Australia would gravely risk exposing the child to physical or psychological harm.

As explained below, the Court finds that Wilkins has failed to carry her burden. Accordingly, the Court **GRANTS** Jodoin's petition and **ORDERS** the return of A.J. to Australia.

## I.

Jodoin is a citizen of Australia and the father of A.J., a twenty-two-month-old child born in Victoria, Australia. Docket No. 1 ¶ 7; PX-1. Wilkins is an American citizen and A.J.'s mother. Docket No. 1 ¶ 7.

Jodoin and Wilkins began an online romantic relationship in October 2020. In May 2022, Wilkins traveled to Australia to visit Jodoin for the first time, remaining there for approximately three months. Wilkins testified that the two argued frequently during this first summer together. Nevertheless, the two remained in contact after Wilkins returned to the United States in August 2022, and just a few weeks later, Wilkins traveled back to Australia, staying with Jodoin from September 5, 2022, to January 1, 2023. During this three-month visit, the two continued to argue frequently and had their first physical altercation. Wilkins testified that, during one argument in October 2022, Jodoin told her that "he did not like being told what to do," poked her in the chest, and kicked her legs out from under her, causing Wilkins to fall and hit her head. Jodoin denied kicking Wilkins's legs but acknowledged that the two argued and fell to the ground.

Wilkins returned to the United States in January 2023. She claims that Jodoin soon began pressuring her into visiting him again in Australia, repeatedly telling her that she would never find better than him. In June 2023, Wilkins traveled to Australia and lived with Jodoin in a spare room at Jodoin's mother's home. According to Jodoin's verified petition, the two registered their civil union on July 24, 2023, in Victoria, Australia. Docket No. 1 ¶ 7. In February 2024, Wilkins learned that she

was pregnant with A.J. During the pregnancy, Wilkins testified, Jodoin's abuse towards her increased. In one incident, Wilkins claims that Jodoin pushed her onto the bed, told her to "shut the f*** up," and pressed his full weight onto her and her pregnant stomach. In another incident, while eating dinner, Jodoin yanked Wilkins's wrist hard enough to cause bruising in an attempt to prevent her from throwing away food she found too tough to chew.

A.J. was born on October 12, 2024. Shortly thereafter, Wilkins, Jodoin, and A.J. moved into a rental property that was infested with bugs and mice. The parents' relationship deteriorated. Wilkins testified that Jodoin was an inattentive father, occupied by his phone, and repeatedly neglected A.J. On May 9, 2025, during an argument recorded by Wilkins, Jodoin hurled his phone at a television, shattering the screen. RX-7. The video captured the audio of the altercation and later showed a broken TV across from a child's activity table on its side. RX-1. Wilkins claims that Jodoin threw the activity table across the room toward A.J. Although Jodoin disputes this part of the account, he does not dispute that A.J. was in the room when he threw the phone.

In August 2025, Wilkins learned that Jodoin was a member of the National Socialist Network ("NSN"), an Australian organization espousing anti-immigrant, pro-White, neo-Nazi views. Evidence at the hearing indicated that NSN members are sometimes violent, NSN demonstrations often include violence, and the Australian government has recently disbanded the NSN organization. Jodoin admitted that he was previously an NSN member and that he shared many of the

organization's political beliefs. Although Wilkins testified that she worried about A.J. being around NSN members, there was no evidence that Jodoin participated in NSN violence or that Wilkins or A.J. were victims of NSN violence or animus.

At some point in 2025, Wilkins decided to return to the United States with A.J. permanently. She needed Jodoin's consent, however, to obtain a passport for A.J. and to take her outside Australia. Wilkins claims that she agreed to purchase return tickets for her and A.J. only to appease Jodoin. For his part, Jodoin testified credibly that he consented to Wilkins's taking A.J. to the United States—but only for a brief visit and that he expected that Wilkins would return with A.J. in January 2026.

On December 8, 2025, Wilkins traveled to Texas with A.J. to visit family. Docket No. 1 ¶ 8. On the day of her expected return, January 28, 2026, Wilkins told Jodoin that she and A.J. would not be returning to Australia. PX-3; PX-5. Jodoin expressed surprise and objected. PX-5.

On May 5, 2026, Jodoin initiated this Hague Convention proceeding, arguing that Wilkins's retention of A.J. in the United States is wrongful and requesting the Court to order the child's return. Docket No. 1.

## II.

The Hague Convention governs civil proceedings filed in signatory countries for the recovery of wrongfully removed or wrongfully retained children. As the Supreme Court explained, the Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). A "core premise" of the Convention is that a child's

interests "are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Hague Convention, Preamble). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id.* (citing Hague Convention, Art. 12).

Both the United States and Australia are signatory countries. ICARA implements the Hague Convention in the United States and empowers federal courts to order the return of children removed or retained in violation of the Convention. 22 U.S.C. § 9001(b)(4); *Abbott*, 560 U.S. at 9. Importantly, neither the Hague Convention nor ICARA is a custody statute. ICARA plainly states that "[t]he Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). If a child has been wrongfully removed or retained, the court is required to order the child's return, unless certain exceptions apply. *See* 22 U.S.C. § 9001(a)(4); *Abbott*, 560 U.S. at 9; *Monasky*, 589 U.S. at 72. "It is then up to the courts of the 'habitual residence' to decide the substantive merits of the underlying custody issue." *Smith v. Smith*, 976 F.3d 558, 561–62 (5th Cir. 2020).

As many courts have noted, "'the Convention reflects a design to discourage child abduction.'" *Soto v. Contreras*, 880 F.3d 706, 710 (5th Cir. 2018) (quoting *Lozano v. Montoya Alverez*, 572 U.S. 1, 16 (2014)); *see also Abbott*, 560 U.S. at 20 (explaining that the Hague Convention "deter[s] child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes").

**A.**

A petitioning parent has the burden of establishing by a preponderance of the evidence that the removal or retention of a child was wrongful. *See* 22 U.S.C. § 9003(e)(1)(A); *Golan v. Saada*, 596 U.S. 666, 671 (2022) (citing § 9003(e)(1)). The petitioner must prove: "(1) that the respondent removed or retained the child somewhere other than the child's habitual residence; (2) that the removal or retention violated the petitioner's rights of custody under the habitual-residence nation's laws; and (3) that at the time of removal or retention, petitioner was exercising those rights or would have exercised those rights but for the removal or retention." *E.g.*, *Delgado v. Osuna*, 837 F.3d 571, 577 (5th Cir. 2016) (citing *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012)); Hague Convention, Art. 3.

Here, the parties stipulated at the outset of the hearing that these elements are met. Indeed, the evidence shows that A.J.'s habitual residence is Australia, Wilkins retained A.J. in the United States in violation of Jodoin's rights of custody under Australia law, and that Jodoin was exercising those custody rights at the time of the wrongful retention. PX-1; PX-2; PX-8; PX-9.

The Court thus finds that Jodoin has satisfied his burden of showing that A.J. has been wrongfully retained. *See, e.g., Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (holding that respondent wrongfully removed children from Australia, which was the children's habitual residence, and that the petitioner was exercising his rights of custody at the time of removal).

**B.**

Under the Hague Convention and ICARA, the Court shall order the prompt return of A.J. "unless one of the narrow exceptions set forth in the Convention applies." Hague Convention, Arts. 12, 13; 22 U.S.C. § 9001(a)(4); *see also, e.g., Abbott*, 560 U.S. at 5. These exceptions "are to be interpreted narrowly to avoid undermining the objectives of the Convention." *E.g., Hernandez v. Garcia Pena*, 820 F.3d 782, 787 (5th Cir. 2016).

Here, Wilkins asserts two defenses: consent and grave risk of harm.

**1.**

First, consent. A court is not "bound to order the return of the child" if the respondent establishes by a preponderance of the evidence that the petitioning parent "had consented to or subsequently acquiesced in the removal or retention." Hague Convention, Art. 13(a); 22 U.S.C. § 9003(e)(2)(B). Wilkins has failed to make that showing here.

At the hearing, Wilkins submitted evidence that, a few months before she took A.J. to the United States, Jodoin encouraged her to leave and not return. RX-12. And Jodoin later assisted Wilkins with getting a passport for A.J. Indeed, Jodoin texted Wilkins in the Fall of 2025 that he wanted Wilkins to take A.J. to be with Wilkins's family, that it "would be best for [A.J.]," that he did "not expect [Wilkins] to come back," and that A.J. "can . . . skype me when she gets older if she wants." RX-12. Jodoin credibly testified, however, that he later changed his mind and that, by the time Wilkins left Australia in December 2025, he consented only to Wilkins's taking

A.J. to the United States for a brief visit. Wilkins corroborated Jodoin's testimony, conceding that Jodoin wanted her to return with A.J. and that she agreed to purchase return tickets to appease Jodoin. PX-3. When Wilkins first arrived in the United States, moreover, the parties sent text messages to each other indicating that Jodoin expected and wanted Wilkins to return to Australia with A.J. on January 28, 2026, as the parties had agreed. PX-4. Finally, once Wilkins announced that she was not returning to Australia with A.J., Jodoin expressed surprise and objected. PX-5. In a text to Wilkins, Jodoin stated: "I did not know you weren't coming back until a day before you were supposed to catch a flight. You led me on and kept me in the dark." *Id*. Jodoin filed this lawsuit a few months later.

On this record, the Court finds that Jodoin has neither consented to A.J.'s wrongful retention nor acquiesced in it. *See Nicolson v. Pappalardo*, 605 F.3d 100, 106 (1st Cir. 2010) (holding that father did not consent to his child's permanent move to the United States where he nowhere "expressly agreed" to it and instead indicated by his conduct that he "wanted to continue the marriage," nor did father acquiesce in his child's retention where father "was privately seeking Hague Convention relief" and where the record lacked an unequivocal acquiescence or waiver); *Darin v. Olivero-Huffman*, 746 F.3d 1, 15–16 (1st Cir. 2014) (father did not consent to child's removal where the evidence showed that the parties' "mutual intent was for a visit of limited duration"). Rather, the evidence shows that Jodoin consented only to Wilkins taking A.J. to the United States for a few weeks; expected Wilkins to return to Australia with A.J. on January 28, 2026; objected to the retention; and quickly

invoked his rights under the Hague Convention to demand A.J.'s return. *See Darin*, 746 F.3d at 16 (holding on similar facts that father consented only to child's temporary visit to the United States, not a permanent retention).

Wilkins's first defense fails.

**2.**

Wilkins invokes a second defense available under the Hague Convention—that "there is a grave risk that [A.J.'s] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b). Under ICARA, Wilkins must establish this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A); *Soto*, 880 F.3d at 711. To be clear and convincing, the evidence must "produce[] in the mind of the trier of fact a firm belief . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case." *Waste Mgmt. of Wash., Inc. v. Kattler*, 775 F.3d 336, 341 (5th Cir. 2015) (quotations omitted).

Findings of grave risk, moreover, "are rare." *Soto*, 880 F.3d at 710. The parent opposing a child's return "must show that the risk to the child is grave, not merely serious." *Id.* The "alleged harm 'must be a great deal more than minimal' and 'greater than would normally be expected on taking a child away from one parent and passing [the child] to another.'" *Madrigal v. Tellez*, 848 F.3d 669, 676 (5th Cir. 2017) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)). "[O]therwise, a broad interpretation [of the grave-risk exception] would cause the exception to swallow the

rule and transform the Convention into an arena for custody disputes." *Soto*, 880 F.3d at 710–11 (quotation omitted).

Here, Wilkins argues that A.J. faces a grave risk of harm based on Jodoin's violence toward and mistreatment of Wilkins and because of his "openly proclaimed belief system" regarding "Neo-Nazi involvement and ideology." Docket No. 22 at 12–13. Based on a close review of the record, the Court finds that Wilkins has not clearly and convincingly established a grave risk of harm here.

As an initial matter, there is no evidence that Jodoin was violent toward A.J. Wilkins testified that during the parties' May 2025 argument, Jodoin threw an activity table across the room toward A.J., which Jodoin disputes. The video in evidence is unclear. RX-1. But even assuming Wilkins's version is true, the Court finds that this single outburst, which resulted in no injury to Wilkins or A.J., is not the kind of "serious abuse" supporting a grave-risk finding. *Soto*, 880 F.3d at 710–13; *Altamiranda Vale v. Avila*, 538 F.3d 581, 587 (7th Cir. 2008) (holding that a father's striking his son with a video-game cord on one occasion did not establish a grave risk of harm in returning the child); *cf. Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) (holding that a father's abuse towards his children was "not isolated or sporadic" and thus amounted to grave risk of harm).

The remaining incidents cited by Wilkins involve Jodoin's mistreatment of Wilkins. And although "sustained spousal abuse can, in some instances, create [a grave] risk" to the child, *Soto*, 880 F.3d at 713, courts have routinely held that "limited incidents aimed at persons other than the child, even if witnessed by the

child," are insufficient to establish the grave-risk defense, *e.g., Galaviz v. Reyes*, 95 F.4th 246, 260 (5th Cir. 2024) ("Cases concluding that the grave risk exception has been met often involve the use of physical force that is repetitive or severe."). Here, again assuming Wilkins's version of events is true, the Court finds that Wilkins has shown at most "limited incidents" of abuse—Jodoin kicking or throwing her to the ground in late 2022, pushing her onto a bed and pressing against her pregnant belly in February 2024, and bruising her wrist when she tried to throw away food in 2024. Though certainly abhorrent, this conduct is not the kind of "repetitive" or "severe" physical force sufficient to establish sustained spousal abuse. *Galaviz*, 95 F.4th at 260. It is certainly not "clear and convincing evidence connecting the risk posed to [Wilkins] 'to the eminent possibility of a grave risk to [A.J.].'" *Garcia v. Ramsis*, 2022 WL 287031, *6 (E.D. Tex. Jan. 31, 2022) (quoting *Gallegos v. Soto*, 2020 WL 2086554, at *8 (W.D. Tex. April 30, 2020)).[1]

Wilkins also cites the poor living conditions she experienced while living with Jodoin in Australia and Jodoin's affiliation with the NSN. To be sure, the evidence showed that the home where Jodoin and Wilkins resided with A.J. was at times messy and "mice-infested," RX-5; RX-6, but the Court finds that this does not create the kind of grave risk of harm contemplated by the Convention. *See, e.g.*, *Galaviz,* 95 F.4th at 261 (evidence of children's poor hygiene, poor living conditions, and lack of

[1] Other courts assessing similar facts have likewise concluded that the grave-risk defense did not apply. *See, e.g., Moretti v. Braga*, 2023 WL 3590690, at *19 (N.D. Tex. May 22, 2023) (evidence of physical arguments between father and mother, father's bad temper, and father's drug use did not establish grave-risk defense); *Gallegos*, 2020 WL 2086554, at *8 (evidence that father repeatedly assaulted mother did not establish grave-risk defense); *Stewart v. Marrun*, 2009 WL 1530820, at *4 (E.D. Tex. May 29, 2009) (evidence of periodic spousal abuse did not establish grave-risk defense).

vaccinations did not amount to grave risk). Nor does Jodoin's NSN membership or related views. There was no evidence that Jodoin participated in—or condoned—any violence allegedly committed by NSN members. And although Jodoin expressed opposition to mass immigration and support for a "white Australia," the Court finds that these views alone do not establish the grave-risk defense. Wilkins certainly provided no evidence that Jodoin's fringe beliefs would create a "grave risk that [A.J.'s] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."[2] Hague Convention, Art. 13(b); *see Galaviz*, 95 F.4th at 257 ("Article 13(b) focuses on the risk of harm posed by the child's repatriation. It is not an invitation to determine whether custody with one parent would be in the best interest of the child."). Further, at the hearing, Jodoin testified credibly that he is no longer a member of NSN and does not affiliate with its members.

Wilkins relies heavily on *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008), in arguing that Jodoin's behavior establishes a grave risk of harm. The opposite is true. The facts in *Baran* are so serious and extensive that Jodoin's conduct pales in comparison. In *Baran*, the petitioner-father was "intoxicated on an almost daily basis"; "dr[ove] while intoxicated"; "was violent and unstable"; "berated [the respondent-mother] and intimidated her physically"; "became intoxicated and . . . took [the child], undressed him, and carried him balanced on one hand into the night air before stumbling into a table"; "subjected [the mother] to a six-hour, expletive-

[2] Wilkins called Dr. Victoria Harvey, a clinical psychologist, who briefly testified about how the living conditions in Australia and Jodoin's involvement with NSN might affect A.J. Dr. Harvey's testimony was vague and conclusory. Certainly nothing in her testimony supports a finding of grave risk of harm.

laden barrage of verbal abuse and threats while she held [the child] in her arms"; "repeatedly swung a portable telephone at [the mother's] head, causing [the mother] to fear for her life"; and stated that, when the child grew older, "he would tell [the child] he did not want him." 526 F.3d at 1342–43. There is no evidence of this kind of sustained abuse here.

In sum, Wilkins has not established the grave-risk defense.

**III.**

For the foregoing reasons, it is **ORDERED** that Jodoin's Petition for the return of his child to Australia (Docket No. 1) is **GRANTED**. A.J. is to be promptly and safely returned to Australia.

It is further **ORDERED** that within thirty days after A.J.'s return to Australia, Jodoin may submit a motion for costs and fees, accompanied by a final list of his incurred expenses, including attorney's fees, court costs, and transportation costs related to the return of A.J. *See* 22 U.S.C. § 9007(b)(3). Should Jodoin file such a motion, Wilkins may respond within fourteen days.

**So ordered and signed on this**
**Aug 6, 2026**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE